**Doug WHITE d/b/a White's Construction, Appellant,**

v.

**Wanda PRUIETT, Respondent.**

**No. WD 58509.**

Missouri Court of Appeals, Western District.

March 20, 2001.

**860**

Neysa L. Day, Kansas City, Attorney for Appellant.

Monica M. Fanning, Joanna C. Fryer and Michael A. Smoots, Jr., Kansas City, Attorneys for Respondent.

Before LAURA DENVIR STITH, P.J., and SMART and HOWARD, JJ.

HOWARD, Judge.

Appellant Doug White, doing business as White's Construction (hereinafter referred to as "contractor"), sued Respondent Wanda Pruiett (hereinafter "owner") for breach of contract and unjust enrichment. The trial court entered a directed verdict against contractor on both claims and denied his motion for new trial. He now appeals from the judgment.

We affirm.

## Standard of Review

In directing the verdict against contractor on both of his claims, the trial court determined that contractor failed to present the legal and substantial evidence supporting every fact needed to impose liability that was necessary to warrant submitting his claims of owner's liability to the jury. *Seippel–Cress v. Lackamp*, 23 S.W.3d 660, 666 (Mo.App. W.D.2000). In other words, the court found that contractor failed to produce substantial evidence which, together with reasonable inferences therefrom, if true, had probative force upon the breach of contract and unjust enrichment issues from which the jury could reasonably decide the case. *Id.* Whether the evidence was indeed substantial to permit submitting the case to the jury is a question of law. *Id.*

A directed verdict is a drastic measure. *Seippel–Cress*, 23 S.W.3d at 666. We review the evidence and permissible inferences therefrom in a light most favorable to contractor and disregard contrary evidence and inferences. *Id.* Although we will affirm if we find reasonable grounds supporting the directed verdict, a presumption in favor of reversing the trial court's directed verdict exists. *Id.* Thus, unless we find the evidence adduced at trial and inferences fairly and reasonably deducible therefrom to be " 'so strongly against plaintiff[ ] as to leave no room for reasonable minds to differ,' " we will reverse. *Id.* (quoting *Bridgeforth v. Proffitt*, 490 S.W.2d 416, 423 (Mo.App.1973)).

## Facts

Using this standard, the record reveals the following facts:

In September, 1998, owner's home suffered water damage from a broken water line. State Farm Insurance, with whom owner had contracted for homeowner's insurance, initially offered owner $15,218.57 to settle the claim against her policy for the damage. Pursuant to her policy, owner sought independent bids from several remodeling contractors to determine whether State Farm's offer was sufficient. Contractor received a call from owner requesting that he meet with her concerning the damage to her home.

Over the next five- or six-week period of time, contractor, at owner's request, met with owner at her home several times in order to discuss and evaluate the extent of the water damage to her home and the cost of repair of the same. Contractor also consulted owner over the telephone on several occasions concerning the damage. The work that he recommended included several items, including but not limited to replacement of subfloors, drywall, insulation and tile, which work had not been included in State Farm's initial offer to settle owner's claim.

After State Farm's adjuster obtained the first bid on owner's home and owner

complained, State Farm prepared another offer to settle owner's claim for the sum of $28,059. This offer still did not include all of the items that owner wished to have repaired. Owner therefore invited contractor to attend three separate meetings between owner and State Farm representatives. Contractor's business associate Stan Deal also attended two of the meetings to assist contractor with evaluating the damage to owner's home. During these meetings with State Farm, contractor explained and pointed out the additional damage not included in State Farm's estimate, upon which it had based its offer to settle with owner. At these meetings, owner told State Farm representatives, in the presence of contractor and twice in the presence of his business associate Mr. Deal, that she had chosen contractor to repair the water damage to her home.

At the third meeting with State Farm's representatives, in October, 1998, owner and contractor met with Charles Featherstone, a State Farm adjuster who had more experience in handling large claims for water damage than the previous adjuster assigned to owner's claim. The purpose of the meeting was for a "re-inspection." There were four State Farm representatives present at this meeting, during which contractor again explained why, in his professional judgment and using his experience and expertise, the additional repairs requested by owner were justified and necessary. His explanation included a physical inspection of the damage by tearing out drywall, insulation and other parts of the home that had become black due to the mildew and damaged due to the water. Again, owner stated to the State Farm representatives that she was going to have contractor do the work. Contractor presented two bids for the work to State Farm. His final estimate was for $56,570. At least three other contractors also submitted bids for the work to State Farm in amounts ranging from $13,698 to $43,421. State Farm ultimately agreed to pay owner $58,517.25 to settle the claim. Mr. Featherstone testified that

he did not rely upon the bids in reaching this final offer of settlement made to owner.

At the time owner first called contractor, contractor had been working full time for approximately eight months as a lead subcontractor for MidWestern Builders, one of Kansas City's largest residential remodeling contractors. He quit this job during the time that he was meeting with owner concerning the damage to her home. When he learned that he would not be the contractor to perform the work on owner's home, he was unable to go back to his job at MidWestern, but he did perform subcontracting work for other builders.

When contractor learned that owner and her family intended to repair their home on their own, he filed his claim against owner on two counts—Count I for breach of contract and Count II for unjust enrichment. The case was tried to a jury on December 6 and 7, 1999. At the close of contractor's evidence, owner moved for a directed verdict on both counts. The trial court granted both motions, directing the verdict in favor of owner. This appeal followed.

The issue on appeal is whether contractor made a submissible case on Counts I and II such that the motions for directed verdict should not have been granted.

### Point I: Breach of Contract

In Count I of his first amended petition, contractor alleges that he and owner had an agreement that he would perform the repair work on owner's home. He contends that an oral contract was established by his bid and owner's representation that he would be the contractor performing the work. The trial court directed the verdict on this count, finding that "the first count is not definite enough to form a contract."

In order to make a submissible case of breach of contract, contractor was required to establish: (1) the existence of a

valid contract; (2) the rights and obligations of the respective parties; (3) a breach; and (4) damages. *Howe v. ALD Services, Inc.*, 941 S.W.2d 645, 650 (Mo. App. E.D.1997). As to the first element, contractor alleges the existence of a valid oral contract. In Missouri, the essential elements of an enforceable contract are: (1) competency of the parties to contract; (2) subject matter; (3) legal consideration; (4) mutuality of agreement; and (5) mutuality of obligation. *Zipper v. Health Midwest*, 978 S.W.2d 398, 416 (Mo.App. W.D. 1998). Here, contractor did not establish the existence of an oral contract because he failed to produce substantial evidence of the fourth element, mutuality of agreement. Thus, the trial court did not err in granting a directed verdict on contractor's breach of contract claim.

As this court explained in *L.B. v. State Committee of Psychologists*, 912 S.W.2d 611, 617 (Mo.App. W.D.1995), "[t]he term 'mutuality of agreement' implies a mutuality of assent by the parties to the terms of the contract." Thus, the parties to a contract must have a "meeting of the minds." There must have been, in addition to consideration, an offer and acceptance, which can be discerned by examining the parties' intentions "as expressed or manifested in their words or acts. [Citation omitted.] Whether a contract is made and, if so, what the terms of that contract are, depend upon what is actually said and done and not upon the understanding or supposition of one of the parties." *Gateway Exteriors v. Suntide Homes*, 882 S.W.2d 275, 279 (Mo.App. E.D. 1994).

Especially relevant to this case is the concept that "[n]egotiations or preliminary steps towards a contract do not constitute a contract." *Id.* In this case, contractor met with owner on several occasions in order to "diagnose" the water damage at her home. He prepared a substantial bid to present to her insurance company and even attended several meetings owner had with representatives from her insurance company. Contractor testified that owner represented *to the insurance adjuster*, or to State Farm's representatives, that contractor would be the person who performed the work on her house. Although contractor was present at this meeting, owner never directly acknowledged *to contractor* that he would be doing the work. She made the comment *to the insurance adjuster* in the middle of negotiations with the insurance company to settle her homeowner's insurance claim. When contractor presented her with a formal contract, she would not sign it. Nor did she sign his bid he submitted to do the work. "[An unsigned] bid is no more than an offer to contract." *Sanders v. DeWitt*, 579 S.W.2d 707, 711 (Mo.App. W.D.1979). In fact, contractor testified that he understood that merely submitting a bid did not constitute a binding contract and stated that he usually obtains signed, written agreements. At the last meeting with the insurance company, contractor requested that owner sign a contract, and she refused, indicating that she needed to speak to her husband first. Contractor failed to present sufficient evidence that owner accepted his offer. Without proof of mutuality of agreement, plaintiff's evidence was insufficient to prove the existence of a valid oral contract. Without a showing of the existence of a valid contract, he could not proceed on a breach of contract claim. *Howe*, 941 S.W.2d at 650. Therefore, the trial court did not err in entering a directed verdict on contractor's breach of contract claim.

Point I is denied.

## Point II: Unjust Enrichment

In his second point on appeal, contractor contends that the trial court erred in directing a verdict in favor of owner on Count II of his first amended petition because he offered sufficient evidence of his damages to submit his claim of unjust enrichment to the jury.

We first note that contractor suggests in his brief that because owner did not move for a directed verdict on the basis of no evidence of damages, the trial

court could not so direct the verdict with respect to Count II. Owner responds that such motion was indeed before the trial court. Regardless, "[t]he authority of trial courts to direct a verdict where there is no material issue of fact for the jury to decide 'is part of the inherent power of the court, which is charged with the duty of determining questions of the law.'" *Rustici v. Weidemeyer*, 673 S.W.2d 762, 767 (Mo. banc 1984) (quoting *Home Trust Co. v. Josephson*, 339 Mo. 170, 95 S.W.2d 1148, 1155 (banc 1936)). Thus, even if owner's motion was not premised on contractor's failure to prove damages, the trial court could still properly direct the verdict on those grounds if the evidence was not sufficient on that element to warrant submittal to the jury.

 Therefore, we proceed to contractor's argument that he presented sufficient evidence to make a submissible claim for unjust enrichment. In Count II of his first amended petition, contractor pled in the alternative for recovery under the equitable theory of unjust enrichment. Specifically, he alleged as follows:

2. [Contractor] furnished services to [owner] in discovering, diagnosing and estimating the damage done to [owner's] real property from water damage, and in working with [owner] to explain the totality and extent of the damage to [owner's] insurer based upon his professional expertise as a contractor, thereby increasing the amount of compensation [owner] received by approximately $27,000.

3. [Contractor] devoted time and expertise in assisting [owner as set forth in paragraph 2], allowing [owner] to unjustly profit from [contractor's] experience and expertise by utilizing the same to increase the amount of compensation she received from her insurer.

4. [Owner] accepted the services offered by [contractor] and benefited from

those services through an increase in the amount of compensation [owner] received for the water damage claim from her insurer to the extent of $27,000.

5. The reasonable value of the services that [contractor] furnished to [owner] is $27,000.

As to this count, the trial court directed a verdict against contractor, finding "no evidence of damages."

 A claim of unjust enrichment involves a situation in which a plaintiff claims that:

[A] benefit [was] conferred upon a person in circumstances in which retention by him of that benefit without paying its reasonable value would be unjust. The principle of unjust enrichment has given rise to the doctrine of quasi-contract, also known as a contract implied in law, as a theory of recovery. Courts generally recognize that the essential elements of quasi-contract or contract implied in law are: (1) a benefit conferred upon the defendant by the plaintiff; (2) appreciation by the defendant of the fact of such benefit; (3) acceptance and retention by the defendant of that benefit under circumstances in which retention without payment would be inequitable. The most significant requirement is that the enrichment to the defendant be unjust; that retention of the benefit be inequitable.

*Erslon v. Vee–Jay Cement Contracting Co., Inc.*, 728 S.W.2d 711, 713 (Mo.App. E.D.1987) (citing *Green Quarries, Inc. v. Raasch*, 676 S.W.2d 261, 264 (Mo.App. W.D.1984)). For a quasi-contract based upon unjust enrichment, the amount of the recovery "is not the actual amount of the enrichment, but the amount of the enrichment which, as between the two parties, would be unjust for one party to retain."[1] *Patrick V. Koepke Const., Inc. v. Woodsage Const. Co.*, 844 S.W.2d 508, 515–16 (Mo.App. E.D.1992).

---

**1.** We note that contractor specifically acknowledged both in his brief and in oral argument that he chose not to pursue a claim based upon quantum meruit by attempting to prove the reasonable value of his services in a quantum meruit fashion. *See Johnson Group, Inc. v. Grasso Bros., Inc.*, 939 S.W.2d 28, 30

(Mo.App.E.D. 1997) (discussing the separate remedies for recovery that unjust enrichment and quantum meruit provide based on a quasi-contract theory). Thus, we will not discuss the submissibility of his claim on a quantum meruit basis.

Contractor alleges that he presented evidence upon which to submit the case to the jury on a theory of unjust enrichment. Specifically, he alleges in his brief that he presented evidence of a benefit conferred upon owner "to the extent of additional insurance funds received by [owner] after [contractor], utilizing his professional skills and knowledge as a contractor, spent hours examining and diagnosing the damage at [owner's] home and met multiple times with [owner] and her insurer at [owner's] request, to explain and demonstrate his findings." He claims that owner would not have been able to gain approval for the additional work without his expertise. Thus, he claims that owner was aware of the benefit he provided to her and that she accepted the benefit without compensating him for it. He asserts that because of all of his work in preparing the bids and the fact he quit his job to do the work and owner chose to do the work herself, owner was unjustly enriched "to the extent of the profit [contractor] would have had on the job."

Upon reviewing the record, in a light most favorable to contractor, we find that the trial court did not err in directing the verdict on Count II because contractor failed to produce substantial evidence of the profit he would have received if he did the work, which amount he claims it would be inequitable for owner to retain from the insurance proceeds without payment. Specifically, except for his testimony that he would have profited $28,000 from the job, which profit he claims is the benefit he conferred upon owner, there was no evidence of contractor's lost profits.

As this court recently discussed:

The test for the recovery of anticipated or expected profits has been frequently stated in Missouri. As good a statement as any is that contained in *Morrow v. Missouri,* 140 Mo.App. 200, 123 S.W. 1034, [1039 (1909)]: ' * * * Expected profits are in their nature contingent upon many changing circumstances, un-

certain and remote at best. They may be recovered only when they are made reasonably certain by proof of actual facts, with present data for a rational estimate of their amount; and, when this is made to appear, they may be recoverable.'

In short, the requirement for proof of loss of profits is not absolute certainty, but only a sufficient factual base that the estimate of the loss is not based upon speculation and conjecture. *A mere estimate or opinion of loss of profits, unsupported by factual evidence is insufficient to support an award of lost profits.*

(Emphasis added.) *Gorman v. Walmart Stores, Inc.,* 19 S.W.3d 725, 734–35 (Mo. App. W.D.2000) (quoting *Swiss–American Importing Co. v. Variety Food Prod. Co.,* 471 S.W.2d 688, 690 (Mo.App.1971)) (citations omitted).

In this case, contractor merely stated what he expected his profits to be. He testified that he anticipated approximately a fifty-percent profit of $28,000. He did not testify upon which figures he based this estimate, nor was the amount, or a way of properly calculating it, reflected on either his handwritten or typewritten bids that were admitted into evidence. He did not perform any work on owner's home. In fact, contractor testified that his actions with regard to bidding and negotiation with State Farm were for his benefit, i.e., so he *might* obtain the contract to perform the work. In accordance with *Gorman,* we find contractor's testimony concerning his lost profit to be a "mere estimate or opinion of loss of profits, unsupported by factual evidence." *Id.* at 735; *accord Kopff v. Deves,* 324 S.W.2d 768, 772 (Mo. App.1959) (holding that "[t]o allow plaintiff to simply state what his profits were is not competent evidence but a mere conclusion unsupported by facts").

Moreover, contractor failed to show that owner's retention of the additional insurance funds (in the amount of his anticipated profit) would be inequitable. Owner

paid homeowner's insurance premiums, her home was damaged, and she was entitled to obtain independent estimates of the damage. Having not formed a contract with contractor, as set forth in our discussion of Point I, she was entitled to use the insurance proceeds in whatever manner she saw fit. This is not to say that contractor did or did not offer services to owner. However, as mentioned above, no claim for quantum meruit was made, so we do not address the issue of the services and the reasonable value thereof that contractor provided in inspecting owner's home on multiple occasions.

The trial court had reasonable grounds for finding that contractor failed to produce substantial evidence of unjust enrichment.

Point II is denied.

### Conclusion

Contractor failed to produce substantial evidence that, if true, had probative force upon the breach of contract and unjust enrichment claims he had against owner. Thus, the trial court properly entered a directed verdict on both counts in favor of owner. The judgment is affirmed.

LAURA DENVIR STITH, P.J., and SMART, J., concur.